**Freeman M. COOPER, Plaintiff,**

v.

**WILLIAMSON COUNTY BOARD OF EDUCATION, et al., Defendants.**

No. 80–3393.

United States District Court,
M.D. Tennessee,
Nashville Division.

May 20, 1983.

Richard Manson, Robert Belton, Nashville, Tenn., for plaintiff.

Richard Buerger, Franklin, Tenn., for defendants.

## MEMORANDUM

WISEMAN, District Judge.

This action is before the Court upon objections filed by both parties to the report and recommendations submitted by the Magistrate sitting as special master pursuant to 42 U.S.C. § 2000e–5(f)(5). Plaintiff's complaint alleges that defendant, the Wil-liamson County Board of Education, discriminated against him because of his race in selecting principals for the school system, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The Master found that plaintiff successfully demonstrated he was the victim of unlawful racial discrimination when the Board rejected his application for the principal's position at Page High School in 1974 and when the Board, in 1976, demoted plaintiff to a position as a physical education teacher. The Master also ruled that there was no evidence of racial discrimination in the selection of a principal for Scales Elementary School, and that it was impossible to ascertain whether plaintiff was discriminated against when other openings occurred, inasmuch as plaintiff never applied for those openings. Finally, the Master refused to consider plaintiff's claim regarding a position at Brentwood High School because plaintiff did not plead the Brentwood claim in the original complaint or amended pleadings.

This Court must adopt the Master's findings of fact unless those findings are clearly erroneous. Fed.R.Civ.P. 53(e). Because the Court finds that the findings of fact are not clearly erroneous, those findings will be adopted. However, the Court reaches the same conclusion as the Master by means of a somewhat different legal analysis.

## FINDINGS OF FACT

The Master's report contains extensive factual findings, all of which are adopted. For purposes of explaining the Court's resolution of the objections filed by the parties and its treatment of the Master's conclusions of law, some of those findings are repeated herein. The Master's report reads as follows:

"The chain of events which is the subject of this action began in 1965. It is undisputed that defendant maintained a segregated school system from at least 1870 until at least 1965, and it is undisputed that defend-

ant is an employer within the meaning of the Act.[1]

Plaintiff, Freeman M. Cooper, Sr., was born on March 30, 1927. He graduated from Tennessee State University [then Tennessee A & I University] with a B.S. degree in psychology and a minor in sociology in 1956, and later obtained a Master's degree with a major in sociology and a minor in education from the same institution in 1959. He also completed additional work in school administration, supervision, and finance from 1968 through 1974. In 1965, he was elected by the defendant to serve as principal of the Evergreen School. Defendant admits that plaintiff was fully qualified for this position at the time. The qualifications required for black and for white principals were identical.

In the 1965–1966 school year, defendant operated 19 schools, of which five served black students exclusively. Four schools evidently had some mixture of black and white students. The principals of the schools serving exclusively black children, including plaintiff's school, were all black, and all 39 black teachers [out of 233 total teachers] were employed in the schools with all black student bodies. In short, no black teacher taught white children, nor was any black person the principal of a school where white students attended. The 'all black' schools were Brentwood, grades 1–8; Thompson Station II, grades 1–8; Kirkland, grades 1–8; Leo Buckner, serving grades 1–8; Nolensville II, grades 1–8; and Natchez High School, grades 9–12. Evergreen was formed that year by combining the student bodies of Thompson Station II and Leo Buckner in a new building. Thus, plaintiff's original assignment was to a school with an all black student body and faculty.

Plaintiff's contract as principal was considered to be continuous unless notification to the contrary was given at least 30 days prior to the close of the school year.

In 1966, defendant began its effort to desegregate its dual school system. It adopted a 'freedom of choice' plan, to be implemented in the 1966–1967 school year. Under this plan, any student could attend any school serving his or her grade level, if the student could either arrange transportation to the school privately or could travel to the school on the school bus system. The 'freedom of choice' plan adopted by the defendant included a statement that the Board recognized that desegregation of the faculties of the schools was necessary, and that race, creed, or color would not be a factor in the initial assignment of faculty members. It stated that no principal, teacher, or other staff member would be discharged or demoted on the basis of race, color, or national origin because of actual or expected loss of pupils due to desegregation. It also provided that all faculty and staff of the 1964–1965 school year were re-employed without demotion.

In 1965, the year before the implementation of the plan, there were 5,702 students in the system. Of these, 961, or about 16.8%, were black students. There were 233 teachers in the system, of which 39, or about 16.7%, were black teachers. There were four black principals: plaintiff was principal of Evergreen; Mr. E.B. Johnson was principal of Nolensville II; Mr. William D. Martin was principal of Brentwood; and Mr. William B. Covington was the principal of Kirkland.

The tenure of all of the black principals except for the plaintiff was, however, short-lived, with the advent of defendant's desegregation efforts. In its efforts to integrate student bodies, schools which had previously served only students of one race were merged with schools serving the other. In such mergers, obviously, one principal had to be let go or demoted. Termination or demotion was the fate of all black principals except plaintiff. Plaintiff successfully fought to keep his position in the face of repeated attempts to remove him.

Nolensville I [white] and Nolensville II [black] were merged in 1966. The white

1. The following exhibits will not be considered because they were withdrawn: plaintiff's Exhibits 70 and 113; defendant's exhibits 51, 59, 93, 94, 97, 98, 105, and 106; exhibits 50 and 56 have been combined as exhibit 50. Thus there is no longer a defendant's exhibit 56.

principal of Nolensville I, Mr. Raymond Robertson, became principal of the merged schools, while the black principal of Nolensville II, Mr. Johnson, returned to classroom teaching. Both men had equal experience as principal, but Mr. Robertson had a Master's degree and Mr. Johnson a B.S. Mr. Johnson, however, had more time within the system. When Mr. Johnson returned to classroom teaching, there were four white principals, who remained at their posts, with qualifications less than his, judged in terms of degree or experience.

In February of 1967, Natchez High School was designated as the vocational annex to Franklin High School and Franklin's white principal became principal. Ultimately, the black principal of Natchez high School, Mr. Spencer, resigned, although there were at least seven white principals with either a lower educational degree or less service. The next month, plaintiff was elected to be principal of Brentwood, a smaller school. The previous principal of Brentwood, Mrs. Harvie L. Watson, a black female, had been demoted to classroom teacher. Pay for each principal was based generally on the number of teachers supervised. Thus, this election constituted a demotion for plaintiff. The Board contemplated that plaintiff's position would be filled by Mr. Spencer, also an effective demotion. The salaries of both men, however, were to remain the same.

Plaintiff apparently complained about the demotion to the Department of Health, Education, and Welfare [HEW]. The Board told HEW that it was not completely satisfied with plaintiff's performance, and that plaintiff would do better with a smaller school. The Master notes that Brentwood was previously all black, and also notes that there is no evidence of record regarding any deficiencies in plaintiff's performance at this time. In August of 1967, the Board voted to return plaintiff to his former position at Evergreen. As noted, Mr. Spencer then resigned.

In April of 1968, defendant notified HEW that it had taken final action on the complete desegregation of all students and faculty for the 1968–1969 school year. [Plaintiff's Exh. 5]. This was defendant's terminal plan for desegregation. HEW conditionally approved the plan, stating that if it achieved the objectives of Title VI [2] defendant would continue to be eligible to participate in federal programs. [Defendant's Exh. 9]. HEW later notified defendant its plan established defendant's continued compliance with Title VI, but requested information regarding personnel decisions made as a result of the plan. The Board replied, on September 4, 1968, that no professional staff had been demoted or dismissed under the plan. [Plaintiff's Exh. 7]. This was not so. Brentwood school, to which plaintiff was to have been sent, was closed. Its black principal, Mr. Mayes Waters, returned to teaching. College Grove and Kirkland were merged. Mr. Covington, the black principal of Kirkland since 1951, was designated 'principal of the building' under the merger. Mr. Windrow, the white principal of College Grove since 1944, was designated principal. It appears that Mr. Windrow died in 1968, and his position was taken by Mr. Harold Ford, who had been hired as a guidance counselor at College Grove in 1967. Thompson Station, a formerly all white school, was merged with Evergreen, with Evergreen adopting the name Thompson Station.

Plaintiff evidently was not initially recommended for the principalship of the new Thompson Station for 1968–1969. On March 19, 1968, the PTA of Evergreen school wrote to the superintendent, Mr. W.C. Yates, to request that plaintiff be considered for the job. The letter speaks of the superintendent having recommended for principal people serving in only their first year. The Master notes that Mr. Gerald Pantall, principal of Thompson Station in 1967, was in his first year as principal. He had been hired as a teacher in 1965. The record is silent, however, as to who was actually recommended. At any rate,

---

**2.** 42 U.S.C. § 2000d et seq.

the letter highly praised plaintiff's leadership and ability. [Plaintiff's Exh. 58].

On May 14, 1968, plaintiff spoke before the Board on behalf of his principalship. Superintendent Yates, a Mr. Wright, and a Mr. Jacqueth stated that plaintiff's work had not been entirely satisfactory and cited many deficiencies in his supervision of classroom teaching technique, in his knowledge of elementary curriculum and instructional materials, in his rapport with his faculty, and his lack of progressive cooperation with the Administration. Other areas of performance were satisfactory, such as discipline of the school and his relationship with parental groups. The Administration, [apparently the administration of Mr. Yates] stated that it would recommend that plaintiff be placed as a school-home counselor to fill a two-year vacancy in that position because of 'the imperative need for this work.' [Plaintiff's Exh. 61]. There was some promotion involved in terms of salary. Mr. Yates stated that it was felt that plaintiff could serve the 'general needs' of the school system better in this position. Had this change gone through, there would have been no remaining black principal within defendant's school system. Later that month, however, after the Board considered evaluative reports, which have not been produced as evidence in this record, plaintiff was again elected principal, with the understanding that he work more closely with the Administrative staff to improve his general instructional program. As of this time, there is only one piece of evidence relating to any problem perceived in plaintiff's performance: an interview record dated March 25, 1968, which states that plaintiff had a most agreeable and cooperative attitude, but was unable to communicate with the faculty, particularly in giving definite instructions. [Defendant's Exh. 77].

Between 1968 and 1971, four items were placed in plaintiff's file. These concerned his not sending in attendance slips, too many basketball games, an absence from school, and certain accounting procedures and an overdue report. All seem minor.

In March of 1971, plaintiff was unanimously elected guidance counselor at Franklin High School. Also in that month, Mr. Dewey Dodds, chief of the Education Branch of the Office for Civil Rights, informed defendant that minority personnel must be evenly assigned throughout the school system to achieve full desegregation. He stated that after review the system lacked appropriate personnel distribution, and requested information regarding the next year's assignments.

In April of 1971, plaintiff's paycheck was garnished. Mr. Lillard, the new superintendent, stated that the Board looked dimly on such garnishments. Mr. Lillard also wrote plaintiff concerning problems with bookkeeping, and requested certain records. Also in April, plaintiff addressed the Board. He specifically refused to take the position as guidance counselor. Later that month, the Board's accountant as requested wrote to Mr. Lillard, stating that he had kept the books of the system for several years, including the books of Evergreen and the new Thompson Station. He stated that the personnel at these schools did not seem to understand the details of keeping accounts and that there had been some trouble with missing records such as bank statements and cancelled checks. He stated that he had checked some entries for that year, and that better records had apparently been kept. However, he concluded that he had never found any instance of mismanagement of the funds of the school, but that there had been a lack of understanding of record-keeping which had caused him additional work. At the end of April, the Board voted to offer plaintiff his choice of jobs: principal or guidance counselor.

In June of 1971, Mr. Dodds replied to Mr. Lillard's letter of June 1st [plaintiff's Exh. 9], wherein Mr. Lillard submitted a roster of personnel and his assurance that black teachers would be assigned so that the ratio of teachers would comply with the

*Singleton* decision.[3] Mr. Dodds stated that it appeared to be necessary to make adjustments in the assignments at Thompson Station and Fairview Elementary Schools, but noted that projections did not show vacancies in these schools from which assignments could be made in meeting the *Singleton* ration. He stated that three other schools which presented problems [Fairview High, Hillsboro High, and Lipscomb Elementary] had vacancies which could be filled to meet the necessary requirements. Based on the understanding that Mr. Lillard would make adjustments through recruiting or assignment of personnel, grant funds were approved. In July of that year, the Acting Regional Director of the Office for Civil Rights, William R. Thomas, informed defendant that because his office had not been able to secure voluntary compliance, the file was being referred to the Washington office for possible initiation of enforcement proceedings. [Plaintiff's Exh. 12]. It appears that at this time, plaintiff's school had a racially disproportionate student body. More than half its students were black. Among other reasons, black students from the City of Franklin were allowed to ride buses to attend that school. [Plaintiff's Exh. 11]. Mr. Lillard asked that defendant not be required to make changes in the existing situation because the Board was going to change grade systems the next year.

Mr. Lillard subsequently attempted to recruit Mr. Waters, who had been principal of Brentwood when it was closed, to be principal of Trinity School. [Plaintiff's Exh. 87]. Mr. Waters declined the position.

In September of 1971, the Director of the Office for Civil Rights of HEW wrote to Mr. Lillard stating that the amended desegregation plan submitted August 4th met the requirements of the Civil Rights Act and *Swann*. [Plaintiff's Exh. 13]. He stated that he understood that Burwood and Thompson Station would be paired, and that the seventh and eighth grade students of the two schools would attend Bethesda or Hillsboro. He also stated that it was further understood that the system would adhere to the *Singleton* requirements. Noting the drop in the number of black principals between 1967 and 1971, this letter made it clear that the Board had the responsibility to make personnel decisions on grounds other than race, color, and national origin.

From the foregoing, it is clear that defendant continuously violated the *Singleton* requirements with regard to principalships throughout the period leading up to the challenged employment decisions. Not only did the Board fail to adopt written, objective criteria for making determinations with regard to the reduction in principalships, but also the Board was clearly guilty of discrimination in demoting every black principal, excluding plaintiff, in the system. Judged purely on factors of record—education, experience within the system, and length of experience as a principal—each demotion of a black principal appears to have been based almost entirely upon racial considerations. Plaintiff survived attempts to remove him. As it was, the school over which he was principal continued to have a predominantly black student body.

The reductions in the numbers of the black persons on the staff are set forth in Exhibit 11 to the deposition of Mr. Lillard. [Plaintiff's Exh. 105]. These factors demonstrate that the number of black teachers decreased by six in the period between 1965–1966 and 1974–1975 school years, while the number of white teachers increased by 99. In addition, the number of black principals, teaching or supervising, decreased by three, leaving plaintiff as the only black principal. During this period, however, the ratio of black students to white students decreased. In 1951, black students comprised 21% of the student body. In 1976, this percentage was 8%. [Plaintiff's Exh. 95].

---

**3.** *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir.1970), rev'd in part sub nom. Carter v. West Feliciana *Parish School Board,* 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1970).

The Master concludes that defendant had not established a unitary school system with the terminal plan of the 1968–1969 school year. The Board admitted as much in September of 1971. [Plaintiff's Exh. 1, Admission No. 27].

The Master also concludes that the Board had not achieved a unitary school system by the 1974–1975 school year. The Board had not yet submitted an affirmative action plan relating to faculty desegregation, and had failed to adopt objective criteria upon which to base its personnel decisions, as required by *Singleton*. While the Board had stated in 1971 that it would abide by *Singleton*, it apparently made no real effort to do so with respect to faculty desegregation. Although it is true that HEW approved the terminal plan for the desegregation of the school system in 1968, the Master notes that a unitary school system is not attained by the mere proposal of a plan. *Green v. County School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The fact that HEW approved the plan must be considered in light of the fact that throughout this time, plaintiff's school consistently had a disproportionate number of black students, and that HEW failed to require defendant to explain or rebut the presumption enunciated in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), arising from such disproportion. *Adams v. Weinberger*, 391 F.Supp. 269 (D.C.1975).

Finally, faculty desegregation is a most important consideration in determining if a unitary system has been achieved. *Singleton, supra; Swann, supra*. The Board failed to follow the requirements of *Singleton* throughout this period, and failed to adopt an affirmative action plan until 1975. The statistics relating to minority faculty and staff members establish that defendant's failure to adhere to these requirements was more than a technical error or innocent oversight. The evidence relating to the demotions of the black principals reveals intentional, blatant racial discrimination in the manner in which principals were selected. In short, apart from the evidence relating to disproportionate minority attendance, the evidence establishes that defendant failed to desegregate its faculty, and that defendant's failure was intentional. While the ratio of minority students within defendant's school system decreased during this period, such that the proportion of minority students itself was smaller, this does not alter the fact that defendant attempted to remove black principals from schools when those schools began to serve white students.

*The Subject of the Charges of Discrimination.*

On May 30, 1974, plaintiff formally applied for the position of principal at Page High School, which was due to open for the 1975–1976 school year. At this time, plaintiff was certified by the State of Tennessee in the following areas and positions: elementary education, history, government, sociology, psychology, superintendent, principal 1–9 (advanced), principal 7–12 (advanced), and superintendent of instruction 1–12. [Plaintiff's Exh. 69]. A little more than a month later, Mr. Bobby Greathouse, who is white and who had succeeded Harold Ford as principal of College Grove, also applied. In August Mr. James Parker and Mr. W.T. Sawyer also applied for the job. Both are white. Mr. Parker was assistant principal at Franklin High School, and Mr. Sawyer was principal at Bethesda.

In August and September, defendant also received two communications, one from the Chief of Elementary and Secondary Education Branch of the Office for Civil Rights and one from defendant's attorney. The first repeated a request for submission of an affirmative action plan to 'correct the adverse effects resulting from discriminatory demotions and to restore pre-desegregation percentage of teaching and supervisory principals in the district.' [Plaintiff's Exh. 23]. Defendant's attorney advised defendant regarding the election of a principal. He stated, 'the appointment of a principal prior to consideration of these objective criteria and prior to adopting an affirmative plan of resolving our differ-

ences with HEW would be most unwise.' [Plaintiff's Exh. 71]. At the Board meeting the next day, although selection of a principal was not considered, the Board did consider the problem of overcrowding at Hillsboro, and the lack of students at Burwood and Thompson Station. The supervisor of transportation, Mr. Shipley, explained he had to assign an extra bus to Hillsboro. The Board considered a zoning proposal that no student be permitted to ride a bus past the school where he resided. The motion was tabled for consideration of the implications of zoning, especially in only one area of the county.

On December 17, 1974, defendant Board selected Mr. Greathouse as principal of Page, and Mr. Waters was selected as assistant principal. Plaintiff thereafter filed his charge of discrimination. [Plaintiff's Exh. 108].[4] The Page High School was the result of a merger of College Grove and Bethesda High School. These two schools were made elementary schools.

The stated reasons for the selection of Mr. Greathouse were that he had experience in the high school area of instruction, familiarity with dealing with athletic programs and large faculty and student body activities. The Board pointed out that plaintiff had no such experience. [Plaintiff's Exh. 77]. The Board denied that race was a factor in its failure to promote plaintiff to this job.

The Master concludes that the Board did, in fact, discriminate against plaintiff because of his race in this selection. ... The only written criteria that the Board had adopted for the selection of principals at any of its schools were 'The principals of all schools with fifteen or more teachers must possess a Master's degree in Secondary Education or Elementary Education as the case may be' and 'must possess a certificate to teach from the TN Commission of Education.' [Plaintiff's Exh. 1, Admission No. 12; Plaintiff's Exh. 105, Lillard deposition, at 11, 16]. The plaintiff was

qualified under this written standard. Further, when the Board did submit an affirmative action plan to HEW in May 1975, almost a year after HEW had notified the Board that an affirmative action plan was required on the principalship level, one of the documents attached to the Board's plan stated that, 'Present school board policies are very nebulous as they relate to the hiring, dismissal, and demotion of teachers.' [Plaintiff's Exh. 27].

Plaintiff's qualifications at the time that he applied for the position as principal at Page High were: a B.S. degree from Tennessee State University with a major in psychology and a minor in sociology; an M.S. degree in sociology and education; 27 hours in post-graduate studies in school administration, and tenure of ten years in the Williamson County School system. In addition, plaintiff was certified by the Tennessee Department of Education in numerous areas, including elementary, principal, history, government, superintendent, and psychology. [Plaintiff's Exh. 67]. Several individuals sent letters supporting plaintiff's application for the principalship at Page. [Plaintiff's Exh. 1].

Three white persons applied for the principalship at Page High: Bobby Greathouse; William Sawyer; and James Parker. Mayes Waters, one of the blacks who had been demoted in 1967, [Plaintiff's Exh. 23] also applied for the position. [Defendant's Exh. 58]. On December 17, 1974, as noted earlier, the Board selected Mr. Greathouse as principal of Page and Mr. Waters as the assistant principal.

Shortly after the 1976–77 school year began, the Board closed Thompson Station and Burwood and assigned the students and faculties to other schools in the system. [Defendant's Exh. 114]. Thompson Station was closed despite the fact that, as recently as in 1971, the Board considered it to be an 'excellent primary type building.' [Plaintiff's Exh. 105, at 55, 71]. Plaintiff

---

**4.** There is no question raised regarding timeliness of the charge or exhaustion of administrative remedies. Plaintiff's charge broadly complained of a pattern of discrimination against black faculty, both in the selection of principals and teachers and in the allocation of students.

was demoted to a position as a physical education teacher at another school. [Plaintiff's Exh. 1, Admission No. 76]. This occurred even though plaintiff was not certified as a physical education teacher, [Plaintiff's Exh. 1, Admission No. 78] and even though the Board knew that plaintiff suffered from a back injury which had occurred on the job. [Plaintiff's Exh. 1, Admission No. 79; Defendant's Exh. 122, at 11]. The Board admits that the assignment of plaintiff to the position of physical education teacher in 1976 was a demotion. [Plaintiff's Exh. 1, Admission No. 77]. Plaintiff had a substantial reduction in responsibility because of this demotion, and he described his position as a physicial education teacher as constituting nothing more than a 'teacher's aide.'" [Defendant's Exh. 122, at 8].

[Master's Report at pp. 1084–1091. Conclusions of law interspersed with findings of fact are omitted.]

## CONCLUSIONS OF LAW

*Plaintiff's Page High School Claim*

The Master found that plaintiff was discriminated against by the board in the selection of a principal for Page High School in 1974. This Court concurs in that result but rejects the Master's report insofar as it relies on *Singleton v. Jackson Municipal Separate School District, supra.* The Court must also address herein the objections filed by the Board to the Master's Report.

■ The Master found that the Board ran afoul of the *Singleton* standards when it selected a principal for Page High School. In *Singleton,* the Fifth Circuit implemented guidelines to be followed when a reduction in personnel resulted from the conversion of a school district from a segregated dual system to a unitary system. 419 F.2d at 1217. *Singleton* requires school districts involved in such a transition to formulate written non-racial criteria to assist in the selection of professional staff when jobs are eliminated due to the abolishment of a dual system. The Master ruled that *Singleton* standards also apply to promotions [Master's Report at 14] and concluded that the Board violated *Singleton* by not having established written criteria in 1974 when it still maintained a dual system. The Master erred when he found that *Singleton* standards also apply to instances when promotions are sought.

Plaintiff sought a promotion by applying for the Page High School position. His status as principal at Thompson Station was not affected by the opening of the new Page High School, which resulted from the merger of College Grove and Bethesda High School. Plaintiff does not have a cause of action under *Singleton* because the selection of a principal for Page High School did not cause him to be dismissed or demoted. No reduction in force affected plaintiff's status. Thus, *Singleton* does not apply here.

The Master also found that plaintiff carried his burden of proving disparate treatment as to the Page High School claim under the standard articulated in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *Lee v. Conecuh County Board of Education,* 634 F.2d 959 (5th Cir.1981).

■ The Supreme Court in *Burdine* reiterated the *McDonnell Douglas* test:

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802 [93 S.Ct. at 1824]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were

not its true reasons, but were a pretext for discrimination. *Id.* at 804 [93 S.Ct. at 1825].

450 U.S. at 252–53, 101 S.Ct. at 1093, 67 L.Ed.2d at 215. The Court in *Burdine* stressed that upon the plaintiff's demonstration of a prima facie case, the burden that shifts to the defendant is the burden of *production*, not *persuasion*. *Id.*, 450 U.S. at 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d at 216.

In the action *sub judice,* the Master found that plaintiff carried his burden of persuasion under *Burdine:*

> In summary, then, under the standards of the *Burdine* case, *supra,* the plaintiff prevails in his claim that he was denied the principalship of Page High School in 1974 as a result of racial discrimination. The plaintiff has demonstrated that he was a member of the class being discriminated against; that he had qualifications at least as good as the white candidates; that his lack of high school principalship experience was due to a pattern of racial discrimination by defendant; and that at the time Mr. Greathouse was selected as principal of Page, the Board had not adopted the written objective criteria required by HEW. Under the *Lee* case, *supra,* plaintiff also prevails. A somewhat similar fact pattern in *Lee* showed that the sort of minor complaints alleged by defendant against plaintiff in the present case cannot be regarded as credible in view of the evident pattern of racially discriminatory practices. While defendant has articulated a supposed non-discriminatory rationale for the selection of a white candidate instead of plaintiff in the Page High School principalship, the Court finds that this is pretext.

Master's Report at 1094.

■ This Court also concludes that plaintiff has carried his burden in a disparate treatment case, but for slightly different reasons. Although *Burdine* places only the burden of production on the defendant upon plaintiff's proof of a prima facie case, this Court concludes that a heavier burden is placed upon the Board in this action due to the Board's relatively recent history of discrimination. The Sixth Circuit, in a case involving discrimination against faculty in the context of school desegregation, has held that where a history of racial discrimination is shown to exist, the burden of showing nondiscrimination is on the party having the power to produce the facts. *Rolfe v. County Board of Education of Lincoln County, Tennessee,* 391 F.2d 77, 80 (6th Cir.1968). The Master's report clearly documents racial discrimination by the Board in its treatment of black principals and faculty, and therefore, under *Rolfe,* the burden of proving nondiscrimination rests with the Board. Although *Burdine* places only the burden of production on the defendant once a prima facie case is stated, this Court believes that *Burdine* was not intended to diminish the burden placed on school systems defending Title VII cases arising in the context of school desegregation, where proof of recent racial discrimination is clear. *See Castaneda v. Pickard,* 648 F.2d 989, 994–95 n. 2 (5th Cir.1981) (Title VI action; dicta regarding post-*Burdine* Title VII cases). In a Title VII case arising in the context of a school system with a proven track record of discrimination, the defendant must rebut the plaintiff's prima facie case with clear and convincing evidence that the challenged employment decisions were motivated by legitimate, nondiscriminatory reasons. *See Castaneda, supra; Lee v. Conecuh County Board of Education,* 634 F.2d 959 (5th Cir.1981).

■ In finding that the Board's proffered explanation was unworthy of credence, the Master found that plaintiff possessed qualifications at least as strong as the white candidates for the position at Page. Furthermore, the Master found that the minor complaints in the plaintiff's personnel file could not be regarded as credible in view of the evident pattern of racial discrimination, *citing Lee v. Conecuh Board of Education, supra.* There is ample support in the record for the Master's

findings, and they are adopted by this Court.

One final consideration also supports the Master's conclusion that the Board's proffered explanation is mere pretext. Despite warnings from its own attorney, the Board did not adopt objective written criteria to assist in the decision making process. Although this Court has already ruled that the *Singleton* requirement of written standards does not apply to this claim, the lack of objective criteria is disturbing. The Sixth Circuit has recently stated that

> [c]ourts have frequently noted that subjective evaluation processes intended to recognize merit provide ready mechanisms for discrimination. [citations omitted]. Moreover, the legitimacy of the articulated reason for the employment decision is subject to particularly close scrutiny where the evaluation is subjective and the evaluators themselves are not members of the protected minority.

*Grano v. Department of Development, et al.,* 699 F.2d 836, 837 (6th Cir.1983).

The Board's main purported reason for not hiring plaintiff as principal of Page was that he lacked experience as a principal of a large high school. The Master found that this explanation was not credible, noting that the Board admitted that several white candidates with no prior experience as principal have been appointed as high school principals in Williamson County. [Master's Report at 1094]. This Court agrees with the finding that the Board's articulated nondiscriminatory rationale is pretext and adopts the Master's conclusion that the Board's actions in selecting a principal for Page High School constituted unlawful discrimination. The Board has failed to demonstrate by clear and convincing evidence that its actions were based on legitimate, nondiscriminatory reasons. The Board's objections to the Master's finding, except for the Board's claim that *Singleton* is inapplicable, are hereby overruled.

*Plaintiff's Demotion in 1976*

The Master found that plaintiff also proved that his demotion in 1976 was the result of unlawful discrimination, stating that

> [T]his demotion of plaintiff in 1976 was in the context of the desegregation process in Williamson County. In demoting plaintiff in 1976, the Master finds, the Board violated his rights under *Singleton*, because the Board had not achieved a unitary school system at that time. His qualifications were not considered on the basis of written, objective criteria as required by *Singleton*. [See Plaintiff's Exh. 106, at 24]. Nor did the Board evaluate other professional personnel in the system to determine who should be demoted. [Plaintiff's Exh. 106, at 24–25].

Master's Report at 1095. Upon an independent review of the record, this Court agrees that plaintiff's demotion in 1976, as carried out by the Board, constituted unlawful discrimination.

The Board objects to these findings, arguing that *Singleton* is inappropriate because the closing of plaintiff's school was not part of the desegregation process. To support this claim, the Board points out that both Thompson Station and Burwood were closed upon orders from state Department of Education which found that the schools did not serve enough students. The Court finds, however, that there is ample evidence in the record to support the Master's finding that a unitary system had not been achieved and that the closing of Thompson Station occurred in the context of the overall desegregation effort. First, the record shows that Thompson Station consistently had a disproportionate number of black students, and it appears the Board refused to implement proposals developed by both the Department of Health, Education, and Welfare and the state Department of Education which could have alleviated the student population problem. [Plaintiff's exhibits 79, 80]. When Thompson Station was eventually closed, efforts to incorporate the school into a real unitary system of course came to an end. But the closing of Thompson Station was apparently necessitated by the failure of the Board to incorporate the school into the unitary

system. In this context, the closing was related to the desegregation plan. The ultimate result was simply delayed a number of years. Second, when Thompson Station closed in 1976, there was no unitary system in terms of the faculty and principals. No *Singleton* standards had been implemented. In fact, black principals had been systematically removed from positions of authority. As plaintiff correctly points out, faculty integregation is an integral part of achieving a unitary school system. *See Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 19, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554, 568 (1971). Thus, at least in terms of faculty and principals, no unitary system existed at the time of plaintiff's demotion. *Singleton* was designed to protect individuals such as the plaintiff. Plaintiff's demotion was directly attributable to a reduction in the number of principals during the process of establishing a unitary school system. Consequently, plaintiff's rights under *Singleton* were violated when his qualifications were not considered on the basis of written, objective criteria.

*Other Objections*

■ Plaintiff has filed several objections to the Master's Report which shall be addressed herein. First, plaintiff contends that the Master erred by refusing to consider plaintiff's claims of discrimination involving principalship vacancies at other schools because plaintiff did not apply for those positions. The Court finds that the Master did not err. Plaintiff forcefully argues that the "doctrine of futility" as enunciated in *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), acts to bring these other claims before the Court. To invoke this doctrine, plaintiff must first establish that he would have applied for the job had it not been for the discriminatory practices. *Id.* at 368, 97 S.Ct. 1843, 1871, 52 L.Ed.2d at 435. Inasmuch as plaintiff applied for some openings, but not others (including the positions plaintiff seeks to bring before the Court at this time) it does not appear that plaintiff believed all applications were a futile ges-

ture. Under *McDonnel Douglas,* a plaintiff generally must show that he applied for the position to establish a prima facie case, and that requirement should not be waived here.

■ Next, plaintiff argues that the Master erred by ruling that plaintiff's claim regarding an opening at Brentwood High School was not properly before the Court. Plaintiff filed this complaint on August 6, 1980. The position at Brentwood High was not filled until May 24, 1982. The Master found that plaintiff did not amend his pleadings to include the Brentwood claim, and that a generalized claim of having been denied "other positions" is insufficient under Rule 8 and Rule 15(a) and (b), Fed.R. Civ.P. Again, this Court agrees with the Master's conclusion. The Board did not consent to try the Brentwood claim [Transcript at 45–47]. Nor does plaintiff succeed under the "like or related" continuing violation doctrine which lets a plaintiff take all similar claims arising from the same set of circumstances to court if one of the claims has been filed with the EEOC. *See Tipler v. E.I. duPont de Nemours & Co.,* 443 F.2d 125, 131 (6th Cir.1971). This doctrine does not do away with the well understood rules regarding pleadings in federal court. Perhaps the doctrine would permit the Brentwood claim to be heard without making plaintiff file a separate EEOC complaint if it had been pled, but it does not allow this Court to act on a claim which arose after the complaint was filed and which never became a part of this action through an amended complaint.

■ Plaintiff also objects to the Master's failure to rule upon his retaliation claim. Having conducted a thorough review of the record, the Court concludes that plaintiff has failed to make out a prima facie retaliation case. To make a prima facie case, a plaintiff must show (1) that he belonged to the class protected by Title VII; (2) that he was qualified for the position that he sought or that he held at the time of the retaliation; (3) that he engaged in an activity protected by 42 U.S.C. § 2000e–3(a); (4)

that the employer knew that plaintiff engaged in such an activity; (5) that subsequently plaintiff was discharged or subjected to other damage; (6) that the employer acted with a retaliatory motive; and (7) that at the time of the retaliation the employer had no intention to eliminate the position that plaintiff sought or held. *Croushorn v. Board of Trustees of University of Tennessee,* 518 F.Supp. 9, 19 (M.D.Tenn.1980). Plaintiff has thoroughly documented several of his claims, and in so doing has made it clear that he has met several of these seven elements. However, plaintiff has not come forth with enough proof regarding his retaliation claim to carry his burden of proving a prima facie case. This is especially true with elements six and seven of the *Croushorn* test. It appears that plaintiff devoted most of his efforts towards proving his allegations regarding the 1976 demotion and the principalship applications and failed to develop the necessary record to support the retaliation claim. Thus, the Court holds that plaintiff has not made out a prima facie retaliation case.

Finally, plaintiff objects to the fact that the Master made recommendations on relief. Plaintiff correctly states that the Master agreed to a bifurcated proceeding, and plaintiff now wishes an opportunity to be heard on the question of relief. This objection is well taken. The Court will recommit this action to the Master solely for purposes of giving the parties an opportunity to be heard on the question of relief.